# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
December 6, 2011 Session

## WILLIAM MISE, ET. AL. V. METHODIST MEDICAL CENTER OF OAK RIDGE, ET. AL.

### Appeal from the Circuit Court for Anderson County
### No. B0LA0014     Hon. Donald R. Elledge, Judge

### No. E2011-01325-COA-R3-CV-FILED-APRIL 23, 2012

This is an appeal from the grant of summary judgment in a medical malpractice case. Virginia Mise was admitted to Methodist Medical Center of Oak Ridge following complaints of abdominal pain, nausea, and vomiting. She was diagnosed with chronic renal failure. Several days later, she died following a medical procedure. Her sons filed suit, alleging that Virginia Mise's treating physicians and nurses failed to comply with the requisite standard of care, causing her death. Methodist Medical Center of Oak Ridge and the treating physicians filed motions for summary judgment. The trial court granted the motions for summary judgment. We affirm the grant of the motions for summary judgment.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which, HERSCHEL P. FRANKS, P.J., and D. MICHAEL SWINEY, J., joined.

Michael S. Shipwash, Knoxville, Tennessee, for the appellants, William Mise and Michael Cantrell.

F. Michael Fitzpatrick and Rachel Park Hurt, Knoxville, Tennessee, for the appellee, Methodist Medical Center of Oak Ridge.

Edward G. White, II, and B. Chase Kibler, Knoxville, Tennessee, for the appellee, Bradley Strnad, M.D.

Libba Bond and R. Scott Durham, Knoxville, Tennessee, for the appellee, Charles Mascioli, M.D.

**OPINION**

## I. BACKGROUND

On November 25, 2008, Virginia Mise ("Decedent") was taken to the emergency room at Methodist Medical Center of Oak Ridge ("MMC"), complaining of abdominal pain, nausea, vomiting, and diarrhea. Randy Lovelace, M.D. evaluated Decedent and initially diagnosed her as suffering from "profound bradycardia, chronic acute renal failure, metabolic/lactic acidosis, hyperkalemia, and possible cardiogenic or septic shock." Ali Yaqub, M.D. subsequently examined Decedent and diagnosed her with hyperkalemia secondary to acute renal failure. A plan was developed to treat Decedent's renal failure, and she was fitted with a temporary pacemaker. Decedent underwent dialysis on December 1.

Decedent's renal function worsened the next day, and she experienced "extremity swelling with concern for central venous obstruction." Decedent was scheduled to undergo central venograms and CO2 arteriograms. Bradley Strnad, M.D., a radiologist,[1] inserted a needle and guide wire into the femoral artery and attempted to guide a catheter into the renal arteries in an effort to obtain diagnostic imaging of the renal arteries and to open the renal arteries, reestablishing blood flow to the kidneys. Dr. Strnad performed the procedures at approximately 8:30 a.m. Dr. Strnad took the diagnostic images and attempted to improve the blood flow to the left kidney. He found that the left renal artery stent that had been placed in an earlier procedure was occluded, impeding his ability to reestablish blood flow to the kidney through that artery. He was unable to view the right renal artery. Following the procedure, he used manual compression to close the femoral artery because he had difficulty with the Angio-Seal closure device. At 10:45 a.m., Decedent returned to the critical care unit, where her vital signs were periodically checked and recorded by Stephanie Carmichael, R.N. ("Nurse Carmichael") per Dr. Strnad's instructions. Charles Mascioli, M.D., an intensivist,[2] examined Decedent at 2:00 p.m. Decedent complained of increased abdominal pain, and Dr. Mascioli noticed that Decedent's abdomen was tender. He ordered a CT scan

---

[1] "[A] physician specializing in the use of radiant energy for diagnostic and therapeutic purposes." Merriam-Webster Online Dictionary (2012) (www.merriam-webster.com (derived from Merriam-Webster's Collegiate Dictionary (11th Ed.))).

[2] "[A] physician who specializes in the care and treatment of patients in intensive care." Merriam-Webster Online Dictionary (2012) (www.merriam-webster.com (derived from Merriam-Webster's Collegiate Dictionary (11th Ed.))).

with contrast of Decedent's abdomen and pelvis. The CT scan was taken at 4:19 p.m., and Decedent returned to her room shortly before 5:00 p.m.

At approximately 5:13 p.m., Decedent's blood pressure dropped. A "code blue" was called, and Dr. Mascioli responded and began emergency efforts to resuscitate Decedent. Decedent had recovered and developed a blood pressure for a limited time when the CT scan was returned. The CT scan revealed a collection of blood in the abdominal cavity, most commonly referred to as an "acute retro peritoneal hemorrhage." Decedent's blood pressure dropped a second time, and her heart beat slowed. At 5:58 p.m., Dr. Lovelace arrived and assisted in a second attempt to resuscitate Decedent. The physicians were unable to resuscitate her, and she was pronounced dead at 6:08 p.m.

Decedent's sons, William Mise and Michael Cantrell (collectively "Plaintiffs"), filed suit against MMC, Dr. Lovelace, Dr. Strnad, Dr. Mascioli, and unknown nurses at MMC (collectively "Defendants"). Plaintiffs contended that Defendants "breached the standard of care for medical providers in Anderson County, Tennessee," causing Decedent's death. Plaintiffs asserted that MMC was liable pursuant to the doctrine of respondeat superior.

An affidavit provided by Dr. Robert R. Boyd was attached to the complaint. The affidavit provided that Dr. Boyd was "familiar with the recognized standards of acceptable professional practice for *physicians* in Oak Ridge, Tennessee . . . at all times material to this case." (Emphasis added). Dr. Boyd stated that Defendants "failed to conform with the recognized standards of acceptable professional practice for *physicians* in Oak Ridge, Tennessee . . . by not taking precautions and closely monitoring [Decedent] after they failed to close the renal artery which was punctured during surgery," causing Decedent's death. (Emphasis added).

Each doctor answered the complaint individually and denied responsibility for Decedent's death. MMC denied responsibility on behalf of the unknown nurses and on its own behalf in response to the respondeat superior claim. Dr. Lovelace subsequently filed a motion for summary judgment, and by agreement of the parties, Dr. Lovelace was dismissed from the suit. MMC filed a motion for partial summary judgment on behalf of the nurses, alleging that Dr. Boyd's affidavit did not provide that he was familiar with the standard of care relevant to nurses or that the nurses breached the applicable standard of care. MMC further argued that there was no "genuine issue as to any material fact regarding the care and treatment" provided by the nurses because the care provided was consistent with the applicable standard of care. In support of its motion, MMC presented Nurse Carmichael's affidavit in which she stated that the treatment provided to Decedent by the nursing staff "was in accordance with the standard of care for registered nurses providing care to critically ill patients in the Anderson County community at that time."

Following MMC's motion for partial summary judgment, Dr. Boyd filed a second affidavit in which he stated, "I am familiar with the recognized standards of acceptable professional practice for physicians *and* nurses in Oak Ridge, Tennessee . . . in light of my active clinical practice and instruction." (Emphasis added). Dr. Boyd further stated that Defendants "failed to conform with the recognized standards of acceptable professional practice for physicians *and* nurses in Oak Ridge, Tennessee . . . by not taking precautions and closely monitoring [Decedent] after they failed to close the renal artery which was punctured during surgery," causing Decedent's death. (Emphasis added).

On March 14, 2011, the deposition of Dr. Boyd was taken. Dr. Boyd was licensed in Tennessee in 1999 or 2000 and maintained his Tennessee license. Through September 2004 to 2006, he was affiliated with the University of Tennessee Family Practice Center in Jackson, Tennessee. Through that affiliation, he presented lectures to residents and allowed residents to accompany him while reviewing surgical cases. Relative to his experiences testifying as an expert, the following colloquy occurred:

Q:    In all of your prior expert work in medical malpractice, have you always testified in the area of surgery expertise?

A:    Yes.

Q:    Have you ever testified in any other medical field, other than surgery?

A:    No, sir.

Q:    Is that the only area of medical expertise that you maintain you hold expertise?

A:    Yes.

Q:    As a surgeon only?

A:    That's correct.

Q:    You do not claim to hold expertise as a hospitalist-physician?

A:    That's correct.

Q:    You do not claim to hold expertise as a radiology physician?

A:      That's correct.

Q:      You do not claim to hold expertise as a radiology technologist or technician?

A:      That's correct.

Q:      You do not claim to hold expertise as a nurse?

A:      That's correct.

Dr. Boyd admitted that he had never performed a venogram or a renal arteriogram. He related that he had performed extremity angiograms, which were different than the procedures performed on Decedent. He had accessed the femoral artery with a needle more than 20 times, but it had been "about a year ago" since he had accessed the femoral artery. He opined that the needle used in the procedure performed on Decedent would have been larger than the needle he used for his procedures. He had personally stopped the flow of blood from the femoral artery using manual pressure, but he had also observed physicians who had closed the femoral artery surgically. He had never used Angio-Seal or observed the use of Angio-Seal but had spoken to cardiologists and radiologists who used Angio-Seal.

Dr. Boyd admitted that Dr. Strnad did not commit any blatant errors in the attempt to access the renal artery. He opined that while he did not observe any errors, Dr. Strnad failed to open the renal artery. Additionally, Decedent suffered from a retro peritoneal hematoma, which was most likely caused by an injury to the renal artery. He said that the bleeding in the back of the abdominal cavity started when Decedent complained "of the additional back pain and the monitors starting going off, alarming[] things of that nature." He believed that Dr. Strnad was negligent in performing the procedure itself, in failing to close the femoral artery, and in failing to stress the importance of monitoring Decedent following the procedure. He also believed that Dr. Mascioli and unknown nurses took an excessive amount of time to evaluate Decedent and to perform the CT scan once evaluated.

Relative to Dr. Boyd's ability to testify regarding each particular standard of care, the following colloquy occurred:

Q:      Now, you are not a nurse, never been a nurse, agreed?

A:      That's correct.

Q:      You cannot testify as to the standard of care for nurses, can you?

A:    That's correct.

Q:    The only physicians that you can testify about the standard of care is a surgeon, agreed?

A:    That's correct.

Q:    So that in terms of your affidavits, either Affidavit 1 or Affidavit 2, you're not offering any standard of care opinions with regard to the nurses who provided care to [Decedent], are you?

A:    My opinions will be based on a physician that's in practice and who practices with nurses.

Q:    My question was: You're not going to offer standard of care opinions with regard to nursing staff, though, are you?

A:    No more than what I've discussed.

Q:    Well, you're not qualified to offer any standard of care opinions with regard to nurses, are you?

A:    I'm not a nurse, I do not work as a nurse; but I do work with nurses with my patients.

Q:    All right.  You work with lawyers, too, don't you?

A:    Yes.

Q:    You know the standard of care for lawyers?

A:    No.

Q:    So you can't testify as to the standard of care for a nurse.

A:    Correct.

Q:    You cannot testify as to the standard of care for a radiologist, correct?

A:    I'm not a radiologist.

Q:      Answer the question.

A:      No.

Q:      Meaning, you cannot testify to the standard of care for a radiologist.

A:      That's correct.

Q:      You cannot testify as to the standard of care for a hospitalist –

A:      Correct.

Q:      – such as Dr. Mascioli or Dr. Lovelace?

A:      Correct.

Q:      You can't testify as to the standard of care for Dr. [Strnad], correct?

A:      He's a radiologist, I'm not; therefore, I cannot – only based on what we've already discussed.

Q:      You cannot offer testimony as to the standard of care for unknown nurses, either, can you?

A:      By me not being a nurse, no.

Later in the deposition, Dr. Boyd was questioned regarding his ability to testify concerning the standard of care applicable to intensivists. The following colloquy occurred:

Q:      And you have never worked full-time in an ICU as an intensivist, have you?

A:      No.

Q:      Okay. On occasion, have you had the opportunity to refer or consult with an intensivist on care of one of your patients?

A:      Frequently.

Q:     And is that because they have specialized training in managing critically ill patients?

A:     Medical issues.

Q:     Okay. And I believe you testified earlier that you do not know the standard of care for an intensivist, is that correct?

A:     That's correct.

During the examination by Plaintiffs' counsel, Dr. Boyd testified that he was familiar with the recognized standards of acceptable professional practice for each applicable speciality. The following colloquy occurred:

Q:     Well, then can you please help me understand? Because I could have sworn in response to one of [defense counsel's] questions, you said that you were not familiar with the standard of care of hospitalists and nurses. Can you please explain that?

A:     I can. I recall [defense counsel] asking, was I a radiologist? Do I perform radiology? Am I qualified to speak as an expert in interpreting x-rays? Am I a radiologist? The answer to that is no. However, as a practicing surgeon, I do - - and I did state this, as well - - I do read CT scans. And I do know what the standard of care is with regard to that within the scope of my surgical practice.

Q:     And in this case, are you able to testify that Nurse Carmichael breached the standard of care for nurses in Oak Ridge, Tennessee?

A:     I can, yes.

* * *

Q:     And are you comfortable testifying that Dr. Mascioli breached the standard of care in this case?

A:     Yes.

Q:     Are you comfortable testifying that Dr. [Strnad] breached the standard of care in this case?

A:    I am.

Q:    And that's so, even though in previous testimony, I wrote down and I thought you said that you were not familiar with the standard of care of radiology.

A:    What I meant by saying that is that I am not a radiologist. If anyone were to ask me, am I a radiologist, the answer would be no. Do I work with a radiologist, do I read films, do I communicate with them, do I interact with them with regard to surgical patients? Yes. Therefore, with regard to that, I am qualified to make that statement.

Q:    Okay. And briefly, . . . can you please tell the [c]ourt how Nurse Carmichael breached the standard of care as it relates to [Decedent] in this case.

A:    Yes. The individual aggressive attention was not there for [Decedent].

Upon further questioning by defense counsel, the following colloquy occurred:

Q:    Are you recanting all of your earlier testimony?

A:    No.

Q:    Are you standing by your opinions?

A:    I'm standing by - - yes, I am.

Q:    And are you standing by all of your testimony in this case?

A:    With - - well, obviously, there has been some discrepancy with regard to me stating that I'm not an - - I'm not able to give the standard of care; and I would like to think that I qualified that.

Q:    Qualified it or recanted?

A:    Well, I like the word qualified.

Q:    All right. You would agree that you are not an expert nurse, agreed?

A:    I am not a nurse.

* * *

Q:    And you would agree, you cannot testify as to the standard of care for nurses?

A:    I can testify to the standard of care of the nurses with regard to caring for patients.

Q:    Just because you've worked with them?

A:    I think that means quite a bit.

* * *

Q:    So you can't offer opinions with regard to radiology technologists in this case, can you?

A:    I have had patients that have had problems similar to [Decedent]; therefore, I feel that I can offer an opinion with regard to that.

* * *

Q:    Doctor, earlier, you told me that you do not know the standard of care for an intensivist in Oak Ridge, Tennessee. And it sounds like you've changed your mind on that . . .

A:    I'd like to qualify. Am I going to say that I am an intensivist if I've had training in that? The answer is no. Have I worked with, had interaction with, worked closely with hospitalists, intensivists with regard[] to care of my patients or a patient similar to [Decedent] that's had a procedure and a potential surgical problem? The answer to that is yes.

Q:    Tell me . . . what do you mean by that?

A:    Well, we work as a team. I have a surgical patient who's got medical issues. I consult them. They have patients with medical issues that so happen to have a surgical problem, they consult me. And together, we come up with a treatment plan to get the patient better.

-10-

Q:     Do you round on patients in the ICU?

A:     Of course.

* * *

Q:     Okay.  But you would agree that Dr. Mascioli, his speciality is critical care medicine.  He is strictly an intensivist, correct?

A:     I agree.

Q:     He's not a pulmonologist, correct?

A:     I agree.  But they do have - - they have knowledge in every facet of internal medicine.  That's part of their training.

Q:     Do you have that training?

A:     No.  Have I had training in the ICU?  Yes, I have.

* * *

A:     Well, I have had training during my surgical residency in ICU management with regard to surgical patients.

Following the deposition, Plaintiffs filed their response to MMC's motion for partial summary judgment and attached a second affidavit.  MMC filed a motion to strike the second affidavit, alleging that Dr. Boyd had given "contradictory testimony regarding his ability to provide expert testimony relative to the standard of care of nurses in Anderson County, Tennessee."  Plaintiffs argued that Dr. Boyd's testimony at the deposition was not contrary to the affidavits and that Dr. Boyd presented a plausible explanation for his testimony.

On April 1, 2011, a hearing was held on MMC's motion for partial summary judgment regarding the claim filed against the nurses.  The court held that Dr. Boyd had given inconsistent testimony on his ability to testify concerning the relevant standard of care for nurses.  The court further found that the affidavit filed by Nurse Carmichael "negated the essential claim" that the nurses had failed to comply with the requisite standard of care and shifted the burden of proof to Plaintiffs to rebut Nurse Carmichael's affidavit.  In its order granting the motion for summary judgment, the court found

that the testimony of Dr. Boyd in his discovery deposition is not sufficient to overcome the motion for summary judgment and Dr. Boyd clearly acknowledged that he was not acquainted with the standard of care for nurses and that he could not offer testimony on that subject. His attempts to explain why he should be allowed to express opinions regarding nurses is insufficient under Tennessee law.

Plaintiffs filed a motion to revise or alter or amend the judgment.

Dr. Strnad and Dr. Mascioli then filed motions for summary judgment. Each doctor alleged that Plaintiffs had not offered competent expert proof in support of their claim because Dr. Boyd was not qualified to render opinions regarding the applicable standard of care. Attached to each motion was a statement of material facts, denying liability. Each motion also included an affidavit in which each doctor stated that he was familiar with the requisite standard of care and that he did not breach that standard of care. MMC filed a second motion for summary judgment, asserting that the respondeat superior claim against it should be dismissed if the claims against Dr. Strnad and Dr. Mascioli were dismissed.

Plaintiffs responded with a third affidavit from Dr. Boyd in which he attempted to further explain his deposition testimony. Dr. Boyd opined that he was "led down the 'primrose path' [by defense counsel] and, unfortunately, gave testimony that [he] was confused on; and for which looking back, was clearly erroneous." Dr. Boyd recounted the relevant testimony before finally stating,

> In summary, although I thought I clarified the confusion I experienced during my deposition, please allow this Affidavit to clear up any additional concerns: **I am able to testify as to the standard of care in this case as to all the Defendants[.]**

In response to each assertion contained in each doctor's statement of undisputed material facts, Plaintiffs responded that it was "[u]ndisputed that [Dr. Strnad or Dr. Mascioli] makes this statement in his self-serving Affidavit."

On May 9, 2011, the court held a hearing on the motions for summary judgment filed by Dr. Strnad, Dr. Mascioli, and MMC. Following the hearing, the court granted the motions for summary judgment and dismissed the claim against Defendants. Plaintiffs declined argument on the motion to revise or alter or amend the court's judgment. The court stated,

> This [c]ourt specifically finds that [P]laintiffs' proffered testimony of [Dr. Boyd] is not sufficient to overcome the motions for summary judgment

-12-

because his testimony, by three (3) affidavits and one (1) deposition, regarding the applicable standards of care is contradictory and therefore negates his testimony. Furthermore, the [c]ourt finds that Dr. Boyd is not qualified to testify as to the standard of care for the various defendants in this case. As a third and independent ground for the grant of summary judgment as to defendants [Dr.] Strnad and [Dr.] Mascioli, this [c]ourt finds that [P]laintiffs did not dispute any material issue of fact which [D]efendants [Dr.] Strnad and [Dr.] Mascioli filed in support of their [m]otions for [s]ummary [j]udgment, showing that there was no genuine issue for trial.

Relative to MMC, the court held,

All claims of independent negligence against [MMC] have been dismissed pursuant to an [o]rder entered April 18, 2011; however[,] the [c]ourt has ruled that the applicable time for filing an appeal from that ruling will be from the date this [o]rder is approved by the [c]ourt. As this [c]ourt has dismissed the claims against defendants [Dr.] Strnad and [Dr.] Mascioli, [MMC] is entitled to summary judgment as a matter of law on the remaining claim of agency pursuant to the law of respondeat superior.

Plaintiffs timely filed their appeal to the trial court's ruling.

## II. ISSUES

We consolidate and restate the issues raised on appeal by Plaintiffs as follows:

A. Whether the trial court erred in disregarding Dr. Boyd's affidavits pursuant to the cancellation rule.

B. Whether the trial court erred in holding that Dr. Boyd was not qualified to testify concerning the relevant standard of care for each defendant.

C. Whether the trial court erred in ruling that Plaintiffs failed to dispute the statements of material facts filed by Dr. Strnad and Dr. Mascioli.

## III. STANDARD OF REVIEW

Summary judgment is appropriate where: (1) there is no genuine issue with regard to the material facts relevant to the claim or defense contained in the motion and (2) the moving party is entitled to judgment as a matter of law on the undisputed facts. Tenn. R. Civ. P.

56.04. A properly supported motion for summary judgment "must either (1) affirmatively negate an essential element of the nonmoving party's claim; or (2) show that the nonmoving party cannot prove an essential element of the claim at trial." *Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1, 9 (Tenn. 2008). When the moving party has made a properly supported motion, the "burden of production then shifts to the nonmoving party to show that a genuine issue of material fact exists." *Id.* at 5; *see Robinson v. Omer*, 952 S.W.2d 423, 426 (Tenn. 1997); *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993). The nonmoving party may not simply rest upon the pleadings but must offer proof by affidavits or other discovery materials to show that there is a genuine issue for trial. Tenn. R. Civ. P. 56.06. If the nonmoving party "does not so respond, summary judgment, if appropriate, shall be entered." Tenn. R. Civ. P. 56.06.

On appeal, this court reviews a trial court's grant of summary judgment de novo with no presumption of correctness. *See City of Tullahoma v. Bedford County*, 938 S.W.2d 408, 412 (Tenn. 1997). In reviewing the trial court's decision, we must view all of the evidence in the light most favorable to the nonmoving party and resolve all factual inferences in the nonmoving party's favor. *Luther v. Compton*, 5 S.W.3d 635, 639 (Tenn. 1999); *Muhlheim v. Knox. Cnty. Bd. of Educ.*, 2 S.W.3d 927, 929 (Tenn. 1999). If the undisputed facts support only one conclusion, then the court's summary judgment will be upheld because the moving party was entitled to judgment as a matter of law. *See White v. Lawrence*, 975 S.W.2d 525, 529 (Tenn. 1998); *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995).

"'In general, questions regarding the admissibility, qualifications, relevancy and competency of expert testimony are left to the discretion of the trial court.'" *Helderman v. Smolin*, 179 S.W.3d 493, 501 (Tenn. Ct. App. 2005) (quoting *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 263 (Tenn. 1997)). Likewise, questions regarding a party's compliance with Rule 56.03 of the Tennessee Rules of Civil Procedure are left to the discretion of the trial court. *Owens v. Bristol Motor Speedway, Inc.*, 77 S.W.3d 771, 774-45 (Tenn. Ct. App. 2001). "A trial court abuses its discretion only when it 'applie[s] an incorrect legal standard or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining.'" *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)). If a discretionary decision is within a range of acceptable alternatives, we will not substitute our judgment for that of the trial court simply because we may have chosen a different alternative. *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999).

## IV. DISCUSSION

Medical malpractice claims are a specialized type of negligence action. Such actions in this state are controlled by the medical malpractice statute, which provides, in pertinent part,

> (a) In a malpractice action, the claimant shall have the burden of proving by evidence as provided by subsection (b):
>
> > (1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;
> >
> > (2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and
> >
> > (3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

Tenn. Code Ann. § 29-26-115(a). The three elements listed in subsection (a) of the statute must be proven by the testimony of a qualified expert. *Williams v. Baptist Mem'l Hosp.*, 193 S.W.3d 545, 553 (Tenn. 2006).

## A.

Plaintiffs argue that the trial court erred in finding that Dr. Boyd's deposition testimony merited the rejection of his affidavits. Plaintiffs note that any inconsistencies in the testimony were explained and did not present an unequivocal and irreconcilable conflict, that medical doctors are not expected to speak with precision on legal matters, and that Dr. Boyd's testimony was corroborated. Defendants respond that Dr. Boyd's testimony was properly discarded because it was contradictory. They argue that Dr. Boyd's subsequent failure to offer a plausible explanation for his contradictory statements merited the application of the cancellation rule, warranting the grant of the motions for summary judgment. MMC notes that Dr. Boyd never presented any evidence in support of his later assertions that he was familiar with the requisite standard of care.

"Tennessee follows the rule that contradictory statements by the same witness regarding a single fact cancel each other out." *Church v. Perales*, 39 S.W.3d 149, 169-70

(Tenn. Ct. App. 2000) (citing *State v. Matthews*, 888 S.W.2d 446, 449 (Tenn. Crim. App. 1993); *Gambill v. Middle Tenn. Med. Ctr.*, 751 S.W.2d 145, 149-50 (Tenn. Ct. App. 1988)). "If determined by the trial court to be contradictory, the statements by the witness are considered to be 'no evidence' of the fact sought to be proved." *Helderman*, 179 S.W.3d at 501 (quoting *Wilson v. Patterson*, 73 S.W.3d 95, 103-04 (Tenn. Ct. App. 2001)). "[I]n order to be disregarded under the so-called cancellation rule, the allegedly contradictory statements must be unexplained and neither statement can be corroborated by other competent evidence." *Perales*, 39 S.W.3d at 170 (citing *Matthews*, 888 S.W.2d at 450; *Gambill*, 751 S.W.2d at 151). "When the cancellation rule is invoked at the summary judgment stage to challenge evidence opposing the motion, the courts must view the challenged evidence in the light most favorable to the opponent of the motion." *Id.* Additionally, "there should not be a dismissal for inconsistency in testimony of a witness unless it represents an unequivocal and irreconcilable conflict." *Gambill*, 751 S.W.2d at 151-52.

The contradictory statements at issue relate to Dr. Boyd's ability to testify regarding the standard of care for each defendant, nurses, an intensivist, and a radiologist. In order to succeed on their claim, Plaintiffs needed to present an expert who was familiar with and who was qualified to offer testimony relating to the requisite standard of care for each speciality. Here, Dr. Boyd's first affidavit failed to satisfy that requirement in that Dr. Boyd provided that he was only familiar with the requisite standard of care for physicians. The second affidavit provided that Dr. Boyd was familiar with the requisite standard of care for physicians *and* nurses, while the third affidavit provided that Dr. Boyd was familiar with the requisite standard of care for *all* Defendants. During the deposition, Dr. Boyd testified on several occasions that he was *unfamiliar* with the requisite standard of care for each applicable defendant. Later, he stated that he never meant to imply that he was unfamiliar with any of the relevant standards of care but that he was merely agreeing with the fact that he was a physician, not a radiologist, an intensivist, or a nurse.

While we acknowledge that Dr. Boyd's harmful statements were made while undergoing examination by defense counsel, we cannot ignore the fact that Dr. Boyd's testimony on his familiarity with each applicable standard of care was inconsistent. Having determined that Dr. Boyd's testimony was inconsistent on this issue, we must now decide whether the inconsistency "represents an unequivocal and irreconcilable conflict." *Id.* In *Gambill*, the testimony at issue was subject to two interpretations, one of which was not inconsistent with the other testimony. *Id.* at 151. Here, Dr. Boyd testified at one point that he was *un*familiar with the requisite standard of care, while he testified at another point that he was familiar with the requisite standard of care. We believe that this contradictory testimony presented an unequivocal and irreconcilable conflict. Indeed, either Dr. Boyd was familiar with the requisite standard of care or he was not. While the questions posed to Dr. Boyd by defense counsel were clear and should have been answered correctly, Dr. Boyd

-16-

offered an explanation for his contradictory testimony during the deposition. Having viewed the challenged evidence in the light most favorable to Plaintiffs, "[w]e cannot say at this summary judgment stage that this explanation for the change in his testimony is not credible as such a credibility determination is not appropriate at the summary judgment stage." *U.S. Waste Atlanta, LLC v. Englund*, No. E2010-01865-COA-R3-CV, 2012 WL 1116350, at *5 (Tenn. Ct. App. Apr. 3, 2012). However, this conclusion does not end our inquiry because the court also ruled that Dr. Boyd was not qualified to offer expert testimony.

B.

A medical expert must fulfill the following requirements in order to testify in a medical malpractice case:

> (b) No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a), unless the person was licensed to practice in the state or a contiguous bordering state a profession or specialty which would make the person's expert testimony relevant to the issues in the case and had practiced this profession or specialty in one (1) of these states during the year preceding the date that the alleged injury or wrongful act occurred. This rule shall apply to expert witnesses testifying for the defendant as rebuttal witnesses. The court may waive this subsection when it determines that the appropriate witnesses otherwise would not be available.

Tenn. Code Ann. § 29-26-115(b). Additionally, a medical expert relied upon by a plaintiff "must have knowledge of the standard of professional care in a defendant's applicable community or knowledge of the standard of professional care in a community that is shown to be similar to the defendant's community." *Robinson v. LeCorps*, 83 S.W.3d 718, 724 (Tenn. 2002). It is critical that expert witnesses actually be familiar with the standard of care in the defendant's community and not "simply assert their familiarity with the standard of professional care in the defendant's community without indicating the basis for their familiarity." *Williams v. Baptist Mem'l Hosp.*, 193 S.W.3d 545, 553 (Tenn. 2006); *see also Stovall v. Clarke*, 113 S.W.3d 715, 723 (Tenn. 2003).

In a medical malpractice case, once a defendant physician has filed a motion for summary judgment with an attached affidavit stating that he did not breach the applicable standard of care, the plaintiff "cannot rest on the allegations in [the]complaint." *Kenyon v. Handal*, 122 S.W.3d 743, 758 (Tenn. Ct. App. 2003). As was the case here, the common and practical response to such a motion and attached affidavit is to submit a contradictory affidavit from a medical expert who satisfies the requirements of Tennessee Code Annotated

-17-

section 29-26-115(b). *Id.* A plaintiff who is "unable to produce an expert affidavit of [his] own face[s] almost certain dismissal of the[] complaint because the physician has effectively negated an essential element of the[] case." *Id.* Additionally, "[w]ithout an opposing expert affidavit, [a plaintiff] cannot demonstrate the existence of a genuine factual dispute regarding whether the physician breached the standard of professional practice in the community." *Id.* Indeed, "summary judgment in favor of [a defendant physician] in a medical malpractice action may be appropriate where the [physician] produce[s] expert proof that completely refutes the plaintiff's allegations of negligence and the plaintiff does not produce rebuttal proof by expert testimony." *Lovin v. Charles E. Nave, D.D.S., P.C.*, No. E2002-00686-COA-R3-CV, 2003 WL 164281, at *4 (Tenn. Ct. App. Jan. 22, 2003). Even if the affidavit contains sufficient rebuttal proof, summary judgment may still be appropriate if the affidavit does not "contain sufficient information to demonstrate that the [expert] is qualified to render an expert opinion and that the [expert]'s opinion will substantially assist the trier of fact." *Kenyon*, 122 S.W.3d at 759 (internal citations omitted).

Here, MMC filed a motion on behalf of the unknown nurses with an affidavit from Nurse Carmichael, declaring that she was familiar with the requisite standard of care and that the nurses complied with that standard. Likewise, Dr. Strnad and Dr. Mascioli filed their own affidavits, declaring their familiarity with the standard of care and that they complied with that standard. Once the motions and accompanying affidavits were filed, Plaintiffs were tasked with submitting rebuttal proof by expert testimony.

### 1. Nurses

Relative to the claim against the nurses, Plaintiffs responded with Dr. Boyd's second and third affidavit filed in this case.[3] In the second affidavit, Dr. Boyd expounded on his qualifications and ability to testify concerning the applicable standard of care. Specifically, Dr. Boyd stated, in relevant part,

> 5. I am familiar with the recognized standards of acceptable professional practice for . . . nurses in Oak Ridge, Tennessee or similar communities at all times material to this case, in light of my active clinical practice and instruction.

Dr. Boyd also asserted that the unknown nurses failed to perform their care of Decedent within the relevant professional standard and that their failure to take the proper precautions

---

[3]We acknowledge that the motion for summary judgment relative to the claim against the nurses had been granted prior to the filing of the third affidavit. However, a motion to alter or amend that judgment was pending prior to the filing of the final order.

and monitor Decedent caused her death. In the third affidavit, Dr. Boyd explained his deposition testimony concerning his ability to testify regarding the standard of care for nurses by stating,

> I was asked questions such as "am I a nurse?"; "am I a radiologist"; "am I an internist?". I am not a nurse, radiologist nor an internist. Nevertheless, over the last 20 years I have worked with nurses; I have supervised nurses; I have written orders for nurses; I have viewed orders written by other physicians for nurses, I have trained nurses and I have observed nurses respond to monitors going off, as well as, observed nurses caring for patients.

Dr. Boyd finished by stating that he was "more than capable of testifying as to the standard of care for nurses . . . as it relates to this case" and that he had worked with nurses "on a regular and daily basis."

"[T]he medical malpractice statute may extend to acts of non-physicians, such as nurses, when they are involved in the medical treatment of a patient." *Gunter v. Laboratory Corp. of America*, 121 S.W.3d 636, 640 (Tenn. 2003). A testifying expert need not practice in the same speciality area as the defendant. *Shipley v. Williams*, 350 S.W.3d 527, 356 (Tenn. 2011). However, "the witness must demonstrate sufficient familiarity with the standard of care and the testimony must be probative of the issue involved." *Cardwell v. Bechtol*, 724 S.W.2d 739, 751 (Tenn. 1987).

In an effort to demonstrate his familiarity with the standard of care relevant to nurses, Dr. Boyd stated that he had worked with, supervised, trained, and observed nurses. Based upon his experience, he believed the "individual aggressive attention was not there for" Decedent in that the nurses failed to closely monitor a high-risk patient who underwent an "unsuccessful procedure." While helpful, the fact that Dr. Boyd worked with nurses did not establish that he was familiar with the relevant standard of care applicable in this case, specifically whether the nurses were negligent in their care and observation of a patient in chronic renal failure who had undergone central venograms and $CO_2$ arteriograms. Following our review, we believe that Dr. Boyd did not present sufficient information to demonstrate that he was qualified to render an expert opinion on the standard of care relevant to nurses. Accordingly, the trial court did not err in granting the motion for summary judgment because Plaintiffs failed to submit sufficient rebuttal proof.

## 2. Dr. Strnad and Dr. Mascioli

Relative to the claim against Dr. Strnad and Dr. Mascioli, Plaintiffs responded with Dr. Boyd's second and third affidavit filed in this case. In the second affidavit, Dr. Boyd

expounded on his qualifications and ability to testify concerning the applicable standard of care. Specifically, Dr. Boyd stated, in relevant part,

> 5. I am familiar with the recognized standards of acceptable professional practice for physicians . . . in Oak Ridge, Tennessee or similar communities at all times material to this case, in light of my active clinical practice and instruction.

Dr. Boyd asserted that Dr. Strnad and Dr. Mascioli failed to perform their care of Decedent within the relevant professional standard and that their failure caused Decedent's death. In the third affidavit, Dr. Boyd explained his deposition testimony concerning his ability to testify regarding the standard of care for Dr. Strnad and Dr. Mascioli by stating,

> In addition, over the last 20 years I have worked with radiologists, internists, hospitalists and many other physicians. I have also assisted radiologists, internists and hospitalists in their area of practice; I have viewed orders written by radiologists, internists and hospitalists to nurses; I have spoken with radiologists, internists and hospitalists relative to their care of patients and my care of patients; I have observed radiologists, internists and hospitalists caring for their patients; and I know what the standard of care is for surgical procedures and post-op orders.

Dr. Boyd finished by stating that he was "more than capable of testifying as to the standard of care for . . . radiologists, internists and hospitalists as it relates to this case" and that he had worked with radiologists, internists, and hospitalists "on a regular and daily basis."

Dr. Strnad was a radiologist, while Dr. Mascioli was an intensivist. Dr. Boyd offered testimony in his deposition regarding his familiarity with the applicable standard of care for intensivists like Dr. Mascioli. Regarding the alleged breach of the standard of care, he stated that he believed Dr. Mascioli was negligent in providing follow-up care to Decedent in that Dr. Mascioli ordered a CT scan with contrast, knowing that it would not be done immediately because Decedent would have to ingest the contrast material. He also believed that Dr. Strnad was negligent in performing the procedure and in closing the femoral artery.

Dr. Boyd never performed the procedures in this case. He had not even used the size of needle that Dr. Strnad used to access the femoral artery and had never personally used Angio-Seal to close a femoral artery. Dr. Boyd's experience with the relevant specialists was limited to his observation of and conversations and consultations with the specialists. While Dr. Boyd related that he had training in the intensive care unit with regard to surgical patients, he did not elaborate further on that training. Following our review, we believe that

-20-

Dr. Boyd failed to present sufficient information demonstrating that he was qualified to render an expert opinion on the standard of care relevant to Dr. Strnad and Dr. Mascioli. Accordingly, the trial court did not err in granting the motions for summary judgment because Plaintiffs failed to submit sufficient rebuttal proof.

### 3. MMC

Having concluded that the trial court did not err in granting the motions for summary judgment relative to the claims against Dr. Strnad and Dr. Mascioli, we must also conclude that the trial court did not err in granting the motion for summary judgment relative to the respondeat superior claim against MMC. *Johnson v. LeBonheur Children's Med. Ctr.*, 74 S.W.3d 338, 345 (Tenn. 2002) ("[A] principal may not be held vicariously liable under the doctrine of respondeat superior based upon the acts of its agent . . . when the right of action against the agent is extinguished by operation of law.").

### C.

In case of further appellate review, we will also address the trial court's ruling that dismissal of the claims against Dr. Strnad and Dr. Mascioli was appropriate because Plaintiffs failed to properly respond to the statement of material facts.

Those filing a motion for summary judgment must also file

> a separate concise statement of the material facts as to which the moving party contends there is no genuine issue for trial. Each fact shall be set forth in a separate, numbered paragraph. Each fact shall be supported by a specific citation to the record.

Tenn. R. Civ. P. 56.03. In return, the party opposing the motion

> *must*, not later than five days before the hearing, serve and file a response to each fact set forth by the movant either (i) agreeing that the fact is undisputed, (ii) agreeing that the fact is undispusted for purposes of ruling on the motion for summary judgment only, or (iii) demonstrating that the fact is disputed. Each disputed fact must be supported by specific citation to the record.

Tenn. R. Civ. P. 56.03 (Emphasis added).

Here, Dr. Strnad and Dr. Mascioli filed statements of material facts with their motion for summary judgment. Dr. Strnad's statement provided,

-21-

1. Dr. Strnad performed a central venogram and CO2 arteriogram on December 2, 2008 on [Decedent].

2. This procedure was indicated and appropriate, and at no time did Dr. Strnad puncture the renal artery.

3. At the conclusion of the procedure, hemostasis was achieved by the well accepted technique of manual compression, which Dr. Strnad personally checked and verified.

4. Dr. Strnad gave thorough, written postoperative orders for [Decedent's] continued care and observation.

5. Appropriate precautions were taken, and her monitoring was performed in accordance with the standard of care for interventional radiologists performing CO2 arteriograms in [Anderson County].

6. Dr. Strnad is familiar with the recognized standards of acceptable professional practice for radiologists practicing in [Anderson County], having practiced as a radiologist in Oak Ridge since January 2008, and at all times material to this case.

Plaintiffs responded to each fact contained in the statement as follows:

Undisputed that Dr. Strnad makes this statement in his self serving Affidavit.

Dr. Mascioli's statement provided, in pertinent part,

2. Dr. Mascioli is familiar with the standard of acceptable professional practice applicable to intensivists in [Anderson County].

* * *

14. In providing care and treatment to [Decedent], Dr. Mascioli at all times met the standard of acceptable professional practice applicable to intensivists practicing in [Anderson County].

15. Nothing done or omitted to be done by Dr. Mascioli caused or contributed to any injury to or the death of [Decedent].

-22-

(Citations omitted).  Plaintiffs responded to each pertinent fact contained in the statement as follows:

> Undisputed that Dr. Mascioli makes this statement in his self serving Affidavit.

In the attached consolidated response to each motion, Plaintiffs alleged that there were genuine issues of material fact remaining and further stated,

> In support of this Response, [Plaintiffs] rely on the entire record in this case, the Memorandum of Law, the Affidavit of Dr. Boyd attached as an Exhibit to the Memorandum of Law, the deposition of [Dr. Boyd], and Plaintiffs' Response to All Defendants' alleged Statement of Undisputed Facts filed contemporaneously with this Response.

"This [c]ourt has recognized that a nonmoving party's failure to comply with Rule 56.03 may result in the trial court's refusal to consider the factual contentions of the nonmoving party even though those facts could be ascertained from the record." *Owens*, 77 S.W.3d at 774.  However, "a trial court, acting within its discretion, may waive the requirements of the rule in an appropriate situation." *Id.* at 774-75.  If the trial court refuses to waive the requirements, the moving party's statement of material facts remain undisputed, possibly meriting the grant of the motion for summary judgment.  In this case, Plaintiffs failed to comply with Rule 56.03 of the Tennessee Rules of Civil Procedure, and we do not believe that waiver of the requirements was appropriate.  Consequently, the statement of material facts was undisputed.  Accordingly, the trial court did not err in granting the motions for summary judgment because each doctor alleged in their statement that they complied with the applicable standard of care, leaving no issues for the trial court to consider.

## V.  CONCLUSION

The judgment of the trial court is affirmed, and the case is remanded for such further proceedings as may be necessary.  Costs of the appeal are taxed to the appellants, William Mise and Michael Cantrell.

_____
JOHN W. McCLARTY, JUDGE

-23-